[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION NATURE AND HISTORY OF PROCEEDINGS:
Amber B., whose date of birth is July 15, 1986, is a four year old child who has been in foster care for all but the first eleven months of her life. Amber was adjudicated to be a neglected child on June 19, 1987 and committed to the custody of the Commissioner of the Department of Children and Youth Services, ("DCYS"). That commitment was extended for additional periods of eighteen months on December 12, 1988 and May 18, 1990.
The child is now the subject of a petition to terminate the parental rights of Adeliz S., her mother and Daniel S., her father. The petition was last amended on November 5, 1990, the first day of trial, to include facts which existed up to the date of trial. A motion to amend the petition to add an additional ground of abandonment as to mother was denied as being untimely.
Also on the first day of trial, the maternal grandmother, Rowena B. filed a motion to intervene in the dispositional phase of these proceedings. That motion was granted by the court. On the second day of trial, November 6, 1990, the grandmother filed motions for a psychological evaluation of herself and Amber and for a transfer of Amber's guardianship to the maternal grandmother. The motion for a psychological evaluation was denied by the court as being untimely. The motion for transfer of guardianship is addressed, infra.
FACTS
From the evidence offered at trial, interpreted in the light of the prior record concerning this child, of which the court has taken judicial notice, the court finds the facts referred to within this decision to have been established.
DCYS first became involved with Amber and her two half-siblings in June, 1987 when the children became the subjects of Orders of Temporary Custody. Amber was adjudicated to be neglected on June 19, 1987 and committed to the custody of DCYS. She was placed in the care of her CT Page 159 maternal grandmother where she remained until July, 1988 when she was placed in a new foster home as grandmother was unable to keep Amber in her apartment due to lease restrictions. Finally, on December 8, 1989, Amber was placed with the Simmons family, where she continues to reside.
Testimony of DCYS social worker Donna Biancardi, which the court finds credible, is that mother has resided in eleven locations and had eighteen jobs since Amber was committed. Adeliz has not established residential or employment stability since the time of the child's commitment, nor has she followed through with individual and alcohol counseling as required by court ordered expectations. Mother has visited with Amber sporadically since 1989.
Numerous services have been offered to mother in an attempt to effect a reunification with her daughter with minimal or no success. These services included: visitation with Amber, including transportation; parent-aide assistance; parenting counseling; alcohol and drug counseling; and counseling with the Lutheran Family Services. The evidence is that mother only became minimally involved with these services.
Mother did not follow through with a referral to the Manchester Hospital for alcohol counseling, nor did she follow through with a referral for individual counseling. She did participate in family counseling with Lutheran Family Services but her involvement with that program was discontinued because of her need for individual counseling, which she did not seek.
Kathrina Clark, the Assistant Director of the Exchange Club Parent Aide Program, testified that she supervised seven visits with mother and Amber from May 17, 1990 to June 28, 1990. The first six of the visits were at the home of the maternal grandmother who was present during most of the visits. Mother and grandmother argued for much of the time during the visits. Also, grandmother did not intervene during the visits when mother acted irresponsibly with respect to the case of the child. For example, on one occasion when mother gave Amber piece after piece of candy grandmother ignored the situation and it was Ms. Clark who had to tell mother to stop.
When asked during the trial why she did not intervene when Adeliz acted inappropriately during visits with Amber grandmother testified that they were Adeliz's visits and CT Page 160 therefore she could do whatever she wanted.
Ms. Clark also witnessed an incident with mother and Amber during the last supervised visit on June 28, 1990. The visit took place at mother's apartment complex. These was a wading pool filled with water outside of the building. Mother brought Amber to the pool and asked her whether she wanted to get into the pool and indeed seemed to be encouraging her to do so. Amber, however, who was fully clothed declined mother's invitation to get into the pool. It was clear to Ms. Clark, as it is to the court, that mother's judgement with respect to caring for Amber is poor. She has minimal parenting skills or ability. The Exchange Club refused to supervise visits after the June 28, 1990 visit.
The maternal grandmother never mentioned to Susan Simmons, Amber's foster mother, that she wanted to make a home for Amber. She expressed to Ms. Simmons that she was happy that Amber was in a good home. She even referred to Mr. and Mrs. Simmons as "mommy" and "daddy" when addressing them in front of the child during visits.
Mrs. Simmons indicated that she is interested in adopting Amber if that is possible. Amber thinks of the Simmons other children as her own siblings. She calls Mr. and Mrs. Simmons "mommy" and "daddy". She wants to have her last name changed to Simmons.
Donna Biancardi, the DCYS social worker assigned to this case, spoke with the maternal grandmother in November, 1988 and asked whether she would be interested in assuming guardianship of Adeliz's three children, including Amber. Grandmother told the worker that she could not provide for the children, she was too old and it would be too expensive. Ms. Biancardi raised the issue with grandmother again in August, 1989, indicating that DCYS was considering petitioning for the termination of mother's parental rights. Grandmother was specifically asked if she was interested in adopting Amber. Again, grandmother said no. Finally, the same question was asked of grandmother in February, 1990 with the same answer. At that time grandmother indicated that she thought that the child was in a good home with the Simmons family.
The maternal grandmother told Kathrina Clark of the Exchange Club that she would like to take care of Amber but she could not do so because she found it very difficult in dealing with Adeliz. She testified that if she is given guardianship of Amber she will permit mother to visit with the child once per month for two hours. CT Page 161
The maternal grandmother also testified that she did not remember ever being asked whether she was interested in being Amber's guardian or an adoptive resource for Amber. The court does not find her testimony to be particularly credible in this respect. The court accepts Ms. Biancardi's testimony as to this issue and finds it to be credible.
CLINICAL EVALUATIONS:
There were five psychiatric and psychological evaluations conducted by two evaluators over the course of three years in this case.
The first evaluation was conducted by Dr. David Mantell, a licensed clinical psychologist, on July 28, 1987. He found both mother and father to be immature individuals who at the time of the evaluation were not capable of caring for their children. Dr. Mantell concluded at that time:
 This examiner does not foresee an early return of the children to the permanent care of the biological mother. There are so many issues here that need to be clarified and so much therapeutic work that needs to be done, that one is hard pressed to imagine how this can all be achieved within a reasonable time without great effort and a high level of motivation on the part of the mother and [father]. (Exhibit #5).
Dr. Mantell's second evaluation was conducted on June 22, 1988. He concluded that mother continued to be significantly impaired and there had been no significant improvement in either mother or father. He continued to recommend against placement of any of the children with mother or father. (Exhibit #4).
The final evaluation conducted by Dr. Mantell on June 18, 1990 involved Amber and her father. Mother did not appear. During the evaluation Dr. Mantell observed that Amber identified her foster parents as "daddy" and "mommy", and she was very comfortable in their presence. She described herself as a member of their family which included grandma and grandpa who live next door. Amber made no mention of her maternal grandmother and indicated that she did not see her mother, Adeliz. Evidence before the court is that Amber had a visit the day before with Adeliz and the maternal grandmother. Dr. Mantell testified that it is unlikely that Amber has a significant attachment to the maternal grandmother. He found no evidence of an ongoing parent-child relationship between father and child. (Exhibit #3). CT Page 162
Dr. Mantell testified that the prognosis for parenting improvement in mother was very guarded and indeed improbable, and that there was no ongoing parent-child relationship between mother and child from the perspective of the child. He indicated that permanency planning is extremely important for a child of Amber's age: it is a fundamental requirement and there is no substitute for it. Dr. Mantell voiced the opinion that it would be detrimental to the child to remove her from her current potential adoptive family to which she has bonded and where she is established and secure.
The consequences of experimentation with the child's caregivers over the course of the next year, according to Dr. Mantell, would unsettle the life of the child, inviting her to detach from her present caregivers. It could be terribly chaotic, confusing and harmful to the child. Her caregivers would be placed in a position of competing with one another for the child.
Finally, Dr. Mantell stated that in his opinion that if Amber were to be placed in the care of the maternal grandmother contact with Amber by her biological mother would confuse the child and cause her emotional/psychological harm. He indicated that it is unrealistic to expect that the maternal grandmother would keep mother from Amber.
Dr. Richard Sadler, a licensed child psychiatrist, also conducted two evaluations in this case. He found no difference in mother's condition between the two evaluations. He found no progress at all and he voiced the opinion that no progress could be expected, even with treatment, over the next five years. Dr. Sadler stated that there is no probability that mother will be able to care for the child during that time or the foreseeable future. (Emphasis added).
Dr. Sadler stated that mother should not be given further time to attempt to rehabilitate as further delays in establishing permanency for Amber will be detrimental to the child. It would only delay and inhibit bonding.
Dr. Sadler testified that if mother's parental rights are terminated, any contact between Amber and mother should be in a clinical setting, under strict controls, and monitored closely to determine the effect upon the child.
The following excerpts from Dr. Saddler's report of his first evaluation are reproduced for emphasis. (Exhibit #7).
 It is my opinion that Mrs. [S.] is suffering from a serious psychiatric condition which significantly CT Page 163 affects her ability to organize her thinking and to think in a manner clear enough to plan for her children's best interests. [Her] judgement is so seriously impaired that I would have no confidence that she would be capable of responding to a danger to her children or capable of organizing needed support for her children to minimally adequately address their developmental needs.
 It is my opinion that [mother] is not able to adequately care for her children at this time. It is further my opinion that it is unlikely that [she] will be able to care for her children at any time in the future within a time frame that would be tolerable to her children considering their developmental needs.
 I do not believe that it would be safe for Mrs. [S's] children to live with her currently and I do not believe that there is any reasonable probability that her psychiatric condition could be sufficiently ameliorated over a reasonable period of time in order to allow her to meet the needs of her children for support and parenting.
The following excerpts from Dr. Sadler's second evaluation report of June 12, 1990 are reproduced for emphasis. (Exhibit #6).
 [Amber] responds to her mother with affection and interest. Amber responds to her foster mother as her caretaker. It is to the foster parents that Amber turns for help and support, emotional nurturance and protection. Amber maintains an interest and an emotional relationship with her mother yet Amber does not look to her mother to care for her or to protect her.
 . . . there is an ongoing emotional relationship which only appears positive between Amber and her foster parents. I would, therefor, be very reluctant to displace Amber another time from a relationship with significant caretaking adults.
 I do not feel that there is any hope that at any time in the future that [Adeliz] will be capable of adequately parenting [Amber]. It is my opinion that no psychotherapy, medication treatment or other counseling or therapeutic interventions have any likelihood of changing [mother's] current psychiatric functioning to a degree that would allow her to minimally adequately care for her child. (Emphasis added).
ADJUDICATION: CT Page 164
"Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in an everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well, courts must require strict adherence to statutory standards." In re Migdalia M., 6 Conn. App. 194,203 (1986).
The grounds alleged for terminating the parental rights of father are; (1) acts of commission or omission, (2) abandonment, and (3) no ongoing parent-child relationship. The grounds alleged for terminating mother's parental rights are; (1) acts of commission or omission and (2) failure to rehabilitate.
ACTS OF OMISSION OR COMMISSION:
In order to terminate the parental rights of mother and father on the ground of acts of commission or omission under Section 17-43a(b)(3) the Court must clearly and convincingly find that the child was denied the care, guidance or control necessary for his physical, educational, moral or emotional well-being as the result of an act or acts of commission or omission by the parent.
Without proof of deprivation of care, this ground cannot be found. In Re Juvenile Appeal, 192 Conn. 254, 267 (1984).
There is insufficient evidence to prove by a clear and convincing standard that the child was denied necessary care by an act of commission or omission of wither parent. (Emphasis added). Consequently, the court finds that the petitioner has not proven this ground as to either parent.
ABANDONMENT:
The Connecticut General Statutes sections 17-43a(b)(1) defines abandonment as the parents' failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
 "Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child and no concern for the child's welfare, statutory abandonment has occurred." In Re Rayna N., 13 Conn. App. 23, 36 (1987).
FATHER:
Father was arrested in 1988 for allegedly sexually abusing CT Page 165 Kristie, Amber's half-sister. As a result of those accusations he was advised by DCYS that he would be required to attend therapy before visitation with Amber would be considered. He has not done so.
Father has requested visits with Amber on only two occasions since the child was committed. Both visits were permitted by DCYS, with the last being a Christmas visit with Amber, supervised by the maternal grandmother, in December, 1988. That was father's last regular visit with the child. Since that time the only contact he has had with Amber was during a court ordered psychological evaluation with Dr. Mantell on May 18, 1990.
Father has been in contact with DCYS approximately five times since Christmas, 1988. He did not enquire about Amber's welfare or well-being, nor did he ask to be able to see Amber, on any of those occasions. On the last time DCYS spoke with father was on October 29, 1990, at which time father indicated that he expected his parental rights to Amber to be terminated and that he saw no point in attending the trial.
It is clear from the weight and sufficiency of the evidence that father has failed to visit Amber, he has had no personal interaction with her, he has expressed no concern for her welfare, and he has failed to display love and affection for her, for almost two years. Consequently, the court finds that the ground of abandonment, as defined by statute, has been proven by clear and convincing evidence.
NO ONGOING PARENT-CHILD RELATIONSHIP:
Section 17-43a of the Connecticut General Statutes defines this ground as the absence of an:
 ". . . ongoing parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child[ren] and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child[ren]."
FATHER:
The court finds by clear and convincing evidence that no parent-child relationship exists or has existed between father and Amber for several years. Dr. Mantell evaluated this relationship in July, 1987 and determined that father was unable to relate effectively with the children, including CT Page 166 Amber. Father was seen as being immature with little insight or understanding into his own problems. A second evaluation one year later, in June, 1988, Dr. Mantell found no significant change in father. He was found to be intellectually capable but functionally deficient. Finally, Dr. Mantell's evaluation of May 18, 1990 again revealed no change and no evidence of an ongoing parent-child relationship between father and Amber.
Father has sought to see his daughter only twice over the past two years. He has not taken the steps necessary to be able to visit with the child or be a meaningful part of her life during that period of time. That represents about one half of this child's life. Amber has no knowledge or understanding of this person who is her biological father, and there is no evidence to even suggest that father is interested in establishing a relationship with her.
Father was unable to explain to Dr. Mantell why he had not sought to spend time with his daughter even though he was aware of the termination of parental rights petition.
It is clear that that relationship that normally develops as a result of a parent having met the day-to-day needs of his child does not exist in this case.
Even though no parent-child relationship exists, that alone is not grounds to terminate a parent's rights. The court must also find by clear and convincing proof that to permit further time to establish such relationship would be detrimental to the best interest of the child.
Both Dr. Mantell and Dr. Sadler testified that permanency is of great importance at this time in Amber's life. The court finds that requiring Amber to wait any longer for a father who she does not know, who has shown no interest in her over the past two years, who did not even attend the court proceeding seeking to terminate his parental rights, and who expects his parental rights to be terminated, would be detrimental to her best interest and well-being. Consequently, the court finds this ground for termination of father's parental rights proven by clear and convincing evidence.
FAILURE TO REHABILITATE:
MOTHER:
Section 17-43a(b)(2) of the General Statutes provides for the termination of parental rights in the situation where a parent of a child who has previously been adjudicated as CT Page 167 being neglected fails to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time said parent could assume a responsible position in the life of the child, considering the age and the needs of said child.
"`Personal rehabilitation' as used in the [General Statutes 17-43a] refers to the restoration of a parent to his or her former constructive and useful role as a parent." In Re Migdalia M., 6 Conn. App. 194, 203 (1986).
There has been no improvement in mother's condition or ability to care for her daughter during the pendency of these proceedings over the past three years. The Court finds, by clear and convincing evidence, that because of Adeliz' psychiatric disability and prior personal history it is most unlikely that she will ever be able to develop the ability needed to care for this child's needs with or without extensive support services. See: In re Juvenile Appeal (84-3), 1 Conn. App. 463, 478 (1984).
The court, having carefully reviewed, evaluated and considered the testimony and reports of Dr. Mantell and Dr. Sadler, accepts said evidence as credible, and has afforded considerable weight to the testimony, reports, and opinions of these expert witnesses. "Psychological testimony is rightly accorded great weight in termination proceedings." In re Juvenile Appeal (Anonymous), 177 Conn. 648, 667 (1979).
Based upon the testimony and reports of the clinical evaluators, together with Adeliz' lack of progress in developing parenting skills observed and testified to by other credible witnesses, the court finds clear and convincing proof that mother's psychiatric condition is such as to preclude her from playing a meaningful parenting role in the life of this child in the foreseeable future.
"Termination has been consistently recognized as being in the best interest of the child when the parent has a mental deficiency or illness which renders her unable to provide the child with necessary care." In re Nicolina T.,9 Conn. App. 598, 605 (1987), citing In re Theresa S.,196 Conn. 18, 29-30 (1985); In re David E., 4 Conn. App. 653,657 (1985).
This is a child who has been in a state of uncertainty for more than three years. She is currently living with a loving, caring and nurturing family. She needs to have that environment made permanent in order to maximize her social and emotional growth and development. The court accepts Dr. CT Page 168 Mantell's assessment that permanency is extremely important for a child of Amber's age, and that it would be detrimental to Amber to remove her from her current potential adoptive family to which she has bonded and where she is established and secure.
The court finds clear and convincing evidence that Adeliz has not achieved such degree of personal rehabilitation as to encourage a reasonable belief that and she is likely be able to be able to assume a responsible position in the life of this child within a reasonable period of time.
In her brief, mother argues that the evidence does not prove that "at some future date she can assume a reasonable position in the child's life". (at p. 4). Actually, Dr. Sadler's second evaluation report of June 12, 1990 states just that, exactly. In addition, the standard is no longer whether a parent will ever be able to assume a responsible position in the life of the child, but whether said parent will be able to do so within a reasonable or foreseeable period of time. See: In re Rayna M. 13 Conn. App. 23 (1987).
The court finds that the petitioner has proven, by clear and convincing evidence, that mother has failed to rehabilitate, within the meaning of the statute.
Pursuant to In Re Shavoughn K., 13 Conn. App. 91, 98
(1987), the court's required findings as to the six factors listed in Sec. 17-43a(d). are as follows:
 (1) Numerous services were offered to mother including counseling services through the Manchester Child Protection Team, substance abuse counseling through the Manchester Hospital, stress reduction classes and parenting aide services through the Exchange Club Parenting Aid Program, family counseling through the Lutheran Family Services, visitation with Amber and transportation to facilitate visits by DCYS. Mother has minimally involved herself with or utilized these services, and even her visitation with Amber has been sporadic over the past year.
 While no special services were offered to father, as he was not the caretaker of the child and did not make himself a part of the child's life, he was referred for counseling services and his two requests for visits with Amber were allowed.
 (2) Mother participated in four of the five court ordered psychological and psychiatric evaluations. Father CT Page 169 participated in those evaluations in which he was ordered to participate by the court. Neither parent appeared for trial although both were represented by counsel. Mother's fulfillment of court ordered expectations have been minimal.
 (3) The child is clearly bonded to the foster parents. The court accepts Dr. Mantell's clinical opinion and finds that the child has no significant attachment to the maternal grandmother. While there is some emotional attachment between child and mother there is no positive relationship between the child and either parent from the perspective of the child. There is no evidence of an ongoing parent-child relationship between the child and either parent.
 (4) Amber is four and one half years old with a birth date of July 15, 1986. She is an adoptable child and her foster family has expressed an interest in adopting her.
 (5) Father has made no effort to adjust his circumstances to be able to care for this child. He did not obtain the counseling required of him. He has not maintained regular contact with the child or her caregivers over the past two years. He has abandoned the child and as a result there is no ongoing parent-child relationship in effect between Amber and her father.
 While mother has made some effort, it is clear that even with the exceptional amount of help provided by DCYS and other service providers, she has been and continues to be incapable of adjusting her conduct, circumstances, or conditions to make it in the best interest of the child to be able to return to her care within the foreseeable future. Her visits with the child have become sporadic and she has not established a bond between herself and Amber. She has not developed adequate parenting skills to be able to safely care for this child. There is no reasonable likelihood that mother will be capable of caring for this child, even with massive supportive assistance, within the foreseeable future.
 (6) No one has unreasonably prevented either parent from seeing and establishing a meaningful relationship with this child. Every effort has been made to encourage visitation by the mother. The fact that father has not seen his daughter is a reflection of his conduct and lack of effort, not that of any third party. Economic circumstances have not prevented either parent from playing a meaningful role in Amber's life.
CT Page 170
DISPOSITION:
The court, having clearly and convincingly found grounds for terminating the parental rights of both mother and father, additionally finds that it has clearly and convincingly been proven to be in the best interest of this child that the parental rights of both her mother and father be terminated so that she might be raised in a permanent, secure and nurturing home and environment.
At age four, Amber has been in foster care for more than three fourths of her young life. There is no reasonable likelihood that her parents can or will be able to care for her in the foreseeable future. She can not afford to wait any longer, nor must she be permitted to wait any longer, for a permanent home and family. She has already been in foster care for much too long. The court finds it clearly and convincingly proven that to wait any longer for permanency would be detrimental the the child best interests and well-being.
It is therefore ORDERED that the parental rights of Adeliz S. and Daniel S., in and to Amber B., are hereby terminated.
INTERVENING GRANDMOTHER:
The child's intervening maternal grandmother, Rowena B., has moved to have Amber's guardianship transferred to her in the event the father and mother's parental rights are terminated. The court does not find the maternal grandmother's argument that this would be in the best interest of the child to be persuasive.
Both clinicians, Dr. Sadler and Dr. Mantell, indicated that it would not be in the child's best interests to have unsupervised contact with their mother. Dr. Sadler went so far as to state that any contact should be in a clinical setting, under strict controls. Dr. Mantell testified that if Amber were to be placed in the care of the maternal grandmother contact with Amber by her biological mother would confuse the child and cause her emotional/psychological harm. He indicated that it is unrealistic to expect that the maternal grandmother would keep mother from Amber. Dr. Mantell testified that it would be detrimental to the child to remove her from her current potential adoptive family to which she has bonded and where she is established and secure.
Rowena testified that if she were given custody of Amber she would permit mother to have visits with the child. This would be contrary to the recommendations of the expert CT Page 171 clinicians and not in Amber's best interest. In addition, there is every reason to believe that grandmother's lack of control over Adeliz's inappropriate behavior with respect to the child would continue even though mother's parental rights are terminated. That could well place the child in danger from the mother. Finally, Rowena's failure to seek custody of Amber when offered the opportunity on at least three occasions over the past two years all weigh very heavily against transferring guardianship to her.
The court finds that the maternal grandmother has not produced sufficient convincing evidence that it is in the best interest of the child that guardianship be transferred to her, even by a fail preponderance standard. Therefore, the motion to transfer guardianship to the maternal grandmother is DENIED.
It is ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing this child forthwith in adoption, and to secure that end, the said Commissioner is further ORDERED to submit to the court in writing no later than 90 days from the date of this judgement a report as to the progress toward such adoption and thereafter to report at such times and in such form as the court may from time to time require.
Dated at Rockville this 2nd day of January, 1991.
TERENCE A. SULLIVAN, JUDGE